30 P.3d 275

**Nancy Ann HAYES, Plaintiff–Appellee,**

v.

**Edward E. HAYES, Defendant–Appellant.**

**No. 23146.**

Intermediate Court of Appeals of Hawai'i.

July 24, 2001.

Certiorari Denied Sept. 4, 2001.

**9.** "DH" means "Detention Home." *See* n. 5, *su-*   *pra.*

Richard Lee, Honolulu, Jessi Hall, Paul Hicks, and Brian K. Yomono, on the briefs, Honolulu, for Defendant–Appellant.

Everett Cuskaden and Stephen T. Hioki, on the briefs, Honolulu, for Plaintiff–Appellee.

BURNS, C.J., WATANABE and FOLEY, JJ.

Opinion of the court by BURNS, C.J.

Defendant–Appellant Edward E. Hayes (Edward) appeals the family court's (1) September 24, 1999 Order Granting in Part Plaintiff's Motion for Post Decree Relief Filed May 13, 1999 (September 24, 1999 Order), and (2) January 10, 2000 Order Re: Trial of December 3, 1999 (January 10, 2000 Order). We affirm.

## BACKGROUND

Edward and Plaintiff–Appellee Nancy Ann Hayes (Nancy Ann) were married on August 25, 1968. Their first son was born on March 16, 1969; their second son on July 29, 1971; and their daughter on March 21, 1975.

On October 14, 1996, Nancy Ann filed a Complaint for Divorce.

On June 8, 1998, the family court permitted Paul W. Soenksen to withdraw as counsel for Edward and to impose and record against the marital residence a $25,000 charging lien for attorney fees unpaid by Edward.

On June 23, 1998, the family court entered its Decree of Absolute Divorce (Divorce Decree). The Divorce Decree ordered the sale of the marital residence. Paragraph 7d(i)(2)(f) of the Divorce Decree states as follows:

> The proceeds from the sale of the [marital residence] property shall be used first to pay any brokerage fees and closing costs and any indebtedness secured by the property. The remaining net sale proceeds shall be used to pay off the joint marital bills as further described in paragraph 8(a). The balance of the net sales proceeds are to be divided such that [Nancy Ann] is awarded 60% of the net sales proceeds as an unequal and non-taxable property division and [Edward] receiving the other 40% of the net sales proceeds, subject to the terms of the other provisions of this divorce decree.

Paragraph 13 of the Divorce Decree states, in relevant part, as follows:

> ... Any and all other property not specifically distributed under the terms of this Decree shall be awarded to its legal owner.

> ... [B]oth [Nancy Ann] and [Edward] do hereby fully release, hold harmless and discharge one another of and from all claims which either of them may have or at any time may claim against the other; including but not limited to any and all claims and/or demands of every kind and character whatsoever which either party may have had, or may have as of this date, against one another whether growing out of their relationship as Husband and Wife or otherwise. This mutual release includes any and all claims by either party in and/or to any money, property right or interest of value of any nature whatsoever now or hereafter owned or acquired by the other party singly or jointly with any other.

> Each party states that they have fully disclosed in their respective Asset and Debt statements filed with this court any and all marital assets and debts that they both have, whether said marital assets and debts are in their sole name, in their name jointly with any other person, or that may have been transferred into the name of any other person during the period the parties have been married. [Nancy Ann] is relying upon the full disclosure of the marital assets and debts as contained in [Edward's] filed asset and debt statement in agreeing to a settlement of the divorce upon the terms contained in this Divorce Decree. Accordingly, excluded from the release contained herein, are any and all claims that [Nancy Ann] may have or may acquire in the future of any nature and kind that are derived from acts of fraud or concealment of any marital assets of any kind or nature by [Edward].

> In the event [Nancy Ann] becomes aware of any such assets after the effective date of this Divorce Decree, the parties specifically agree, and the Court so orders, that the Family Court is to have continuing jurisdiction to hear any such claims under Rule 60 of the Family Court Rules and such other Rules and statutory provisions as may be applicable. Further, in the event such action is filed by [Nancy Ann], 75% of the gross value of any such assets found by the court to have been concealed or not fully disclosed at the time of the divorce by [Edward] shall be award-

ed [to Nancy Ann], to be paid to her from the assets of [Edward]. The prevailing party in such action shall also be awarded their reasonable attorney fees and costs.

Paragraph 10 of the Divorce Decree states that "[e]ach party shall pay their own attorneys' fees and costs incurred herein."

In August of 1998 the marital residence was sold for $530,000. After payment of the secured debts (including the $25,000 owed by Edward to his prior attorney in this divorce case) and closing costs, the balance was distributed in accordance with the terms of the Divorce Decree.

On May 14, 1999, Edward left Hawai'i and relocated to San Diego and settled in a residence on June 8, 1999.

The federal Homeowner's Assistance Program (HAP), 42 U.S.C.A. § 3374 (Supp.1998), states, in relevant part, as follows:

**Acquisition of property at or near military bases which have been ordered to be closed**

**(a) Authorization; conditions precedent**

... [T]he Secretary of Defense is authorized ... to reimburse for certain losses upon private sale of, ... any property improved with a one- or two-family dwelling which is situated at or near a military base or installation which the Department of Defense has, subsequent to November 1, 1964, ordered to be closed in whole or in part, if he determines—

(1) that the owner of such property is, or has been, a Federal employee employed at or in connection with such base or installation ...;

(2) that the closing of such base or installation, in whole or in part, has required or will require the termination of such owner's employment or service at or in connection with such base or installation ...; and

(3) that as the result of the actual or pending closing of such base or installation, ... there is no present market for the sale of such property upon reasonable terms and conditions.

**(b) Eligibility for benefits; criteria**

(1) In order to be eligible for the benefits of this section, a civilian employee ...—

(A) must be assigned to or employed at or in connection with the installation or activity at the time of public announcement of the closure action, ...;

. . . .

(4) At the time of public announcement of the closure action, ... such personnel or employees must—

(A) have been the owner-occupant of the dwelling, ....

(5) As a consequence of such closure such employees or personnel must—

(A) be required to relocate because of ... acceptance of employment beyond a normal commuting distance from the dwelling for which compensation is sought, ....

. . . .

**(c) Election of benefits; ....**

Such persons as the Secretary of Defense may determine to be eligible under the criteria set forth above shall elect either (1) to receive a cash payment as compensation for losses which may be or have been sustained in a private sale, in an amount not to exceed the difference between (A) 95 per centum of the fair market value of their property (as such value is determined by the Secretary of Defense) prior to public announcement of intention to close all or part of the military base or installation and (B) the fair market value of such property (as such value is so determined) at the time of the sale, or (2) to receive, as purchase price for their property, an amount not to exceed 90 per centum of prior fair market value as such value is determined by the Secretary of Defense, or the amount of the outstanding mortgages. The Secretary may also pay a person who elects to receive a cash payment under clause (1) of the preceding sentence an amount that the Secretary determines appropriate to reimburse the person for the costs incurred by the person in the sale of the property[.]

On May 13, 1999, Nancy Ann filed a motion requesting the following: "Under [Ha-

wai'i Family Court Rules (HFCR) ] Rule 60(b)(2) and (6) that the Divorce Decree be modified to include as a division of the house sale proceeds, any funds received from the federal government's 'HAP' program[.]" The motion was heard on July 16, 1999.

On August 6, 1999, Edward stated, in his written closing argument, that "[Nancy Ann] should not be entitled to any share, if any, of the HAP benefits as said benefit arises post divorce and is meant to assist a federal civilian employee in relocation." Edward also stated "that though [Edward] has applied, as of this writing no word on [Edward's] eligibility or the extent of any benefit has been received. [Edward] may very well not qualify for any benefit."

On September 24, 1999, District Family Court Judge Christine Kuriyama entered the following order:

1–Based upon the testimony of the parties, the evidence received at trial and the considerations of HRS section 580–47, [Nancy Ann] is entitled to receive 50% of any payments that are made pursuant to the Housing Assistance Program (HAP) in relation to the sale of the parties' former marital residence.

2–Any payments made with respect to [Edward's] relocation or other payments [Edward] is entitled to receive through HAP, are allocated in full to [Edward].

In August of 1999, HAP paid Edward a payment computed as follows:

| | |
|---|---|
| $ 717,250.00 | 95% of prior fair market value of $755,000 |
| $ 530,000.00 | appraised value and actual sale price |
| $ 187,250.00 | taxable private sale benefit |
| $ 55,564.91 | private sale closing costs 1 |
| $ 242,814.91 | total |
| $ 3,520.82 | medicare withheld |
| $ 67,988.17 | taxes withheld |
| $ 171,305.92 | payment |

**1.** This $55,564.91 amount of closing costs included a $1,107.90 survey report, a $25,000 lien for attorney fees owed by Defendant–Appellant Edward E. Hayes (Edward) to his prior attorney in this divorce case, sales commission, title charges, recording charges, pest inspection, postage, and other title fees.

In the family court, Edward noted that "the escrow statement identified $29,3999.98 [sic] in attorneys' fees incurred by [Plaintiff–Appellee

Nancy Ann did not complain about the 50–50 split in the September 24, 1999 Order. On October 1, 1999, she moved for "[a]n order that [Edward] is to immediately convey a check in the amount of $121,407.46 to [Nancy Ann], along with interest of 10% on said amount beginning August 5, 1999." The motion was heard on December 3, 1999.

On December 13, 1999, Edward filed his written closing argument. Based on his interpretation of the September 24, 1999 Order, he argued that he should be allowed to keep all of the $55,564.91 closing costs, the $67,988.17 deduction for federal taxes, and the $3,520.82 deduction for medicare. He further argued that he should be reimbursed $21,522.50 for relocation expenses (airfare, house hunting expenses, per diem expense of $80 per day, the cost "to bring [his] mother accompanied by a nurse to San Diego and her nurse's return flight since [his mother] is disabled and lives in a nursing home and cannot fly alone[,]" shipping, elderly care accommodation, car rental, meals and miscellaneous expenses). He argued that he should be paid $24,001.63 for additional federal taxes and $24,281.00 for state taxes, $32,994 for income reduction of $936 per month for three years as a result of his relocation to San Diego,[2] and credited for $21,753.40 he allegedly paid to Nancy Ann.

On December 13, 1999, Nancy Ann filed her written closing argument.

On January 10, 2000, District Family Court Judge Paul T. Murakami entered an order which stated, in relevant part, as follows:

The Court notes that [Nancy Ann's October 1, 1999] Motion is primarily a motion to define the parameters for distribution of a lump sum amount paid to [Edward] under the Housing Assistance Program (hereinafter "HAP"). It is noted that this

Nancy Ann Hayes] which HAP [Homeowner's Assistance Program] had a choice to reimburse but elected not to do so."

**2.** In a document filed on August 6, 1999, Edward asserted that he gave "up a 25% tax free COLA [Cost of Living Allowance] in exchange for an 8.62% taxable COLA applicable to federal employees in the [sic] San Diego, California." He did not compare the actual costs of living.

award came under scrutiny of the Court previously under an order issued ... on **September 24, 1999** wherein a division was ordered between the parties. The specific issue raised in the instant motion is that [Nancy Ann] contends that the division should be 50% to each party, while [Edward] is alleging that [Edward] should be unilaterally awarded certain offsets, and that the remaining balance thereupon be equally divided. This court, ... **HEREBY ORDERS AS FOLLOWS:**

1. Again, it should be noted that [Nancy Ann's] position is could be [sic] construed as a request for clarification of [the September 24, 1999] prior order. However, neither party has raised an objection to this Court deciding the matter. Therefore, the Court initially observes that as to the proposed allocation "off the top" of the HAP lump sum, the Court does believe that [Edward] should be afforded some credit, though not as much as he claims.

a) With regard to the relocation expenses, [Edward] should be credited with certain relocation expenses, specifically, those expenditures related to his airfare, transportation, hotel and temporary lodging. This would include his new wife, but not his mother, as while there may be a moral responsibility to provide for his mother, there is no legally binding responsibility to do so. Therefore, ... [Edward] shall be credited $ **6,015.75,** .... The claimed per diem expenses are disallowed, as are those expenditures made on behalf of [Edward's] mother. The former is denied as speculative and without foundation.

b) With regard to the issue of the attorney's lien, while apparently allowed by the HAP program, the Court will simply note that said lien as well as the other closing costs were lumped together in escrow. This lien as well as other costs, was part of the escrow costs reimbursed by HAP, and per Judge Kuriyama's order, said costs as reimbursed were to be split 50/50. Therefore, the $ **55,564.91** credit from HAP shall be equally split between the parties, per the September 24, 1999 order.

c) [Edward's] claim for $ **21,753.40** previously paid is denied, and said amount is instead to be credited in [Nancy Ann's] favor. In the Court's mind, there is no reasonable argument to consider said sum as being encompassed under Judge Kuriyama's order. The issue that said sum is related to has been previously decided and is likewise reflected in prior orders.

d) Based on the foregoing, the Court's calculation of the gross proceeds that are equally divisible are as follows:

$ **242,814.91**    (amount from HAP)
    **6,015.75**    (moving expenses of [Edward])

$ **236,799.16**    gross total to be divided

Put another way, this means that [Nancy Ann] is to receive, in gross, and before taxes, $ **118,399.58,** and [Edward] is to receive, in gross, and before taxes, $ **124,415.33.**

2. Pursuant to the credible testimony, revised W–2 forms can be re-issued, and they should be for the respective gross amounts. Each side is to [be] responsible for their [sic] own taxes. [Nancy Ann] is to make the inquiries and necessary arrangements as to said re-issuance, and [Edward] is to fully cooperate with said efforts[.]

(Emphases in original.)

On February 8, 2000, Edward filed a notice of appeal.

On March 30, 2000, the court entered its findings of fact and conclusions of law which stated, in relevant part, as follows:

## I. FINDINGS OF FACT:

....

4. The September 24, 1999 order dividing any HAP proceeds awarded was the law of the case.

5. The issue before this court was the determination of the actual amount of the division to be awarded to each party.

6. Neither party objected to this court hearing the matter.

7. The gross amount of the HAP award was $242,814.91 ....

8. Included in the HAP award were certain escrow fees and costs of $55,564.91.

9. The escrow fees and costs were part of the award made by HAP and are sub-

ject to division between the parties in accordance to the September 24, 1999 order.

10. The $55,564.91 credit for escrow fees and costs from HAP is to be equally divided between the parties.

11. There is no credible evidence to support the claim by [Edward] for credit of $21,753.40.

. . . .

14. By his own testimony, [Edward] did not have a legal obligation to provide for his mother.

. . . .

18. The federal income tax and Medicare tax were withheld from the HAP award by the government prior to any payment to [Edward].

. . . .

22. The court deems it fair and reasonable that both parties, consistent with the terms of the divorce decree, pay their own share of federal and Medicare taxes in regards to the HAP payments they each receive.

23. [Edward's] claim for credit due to his income reduction suffered as a result of his voluntary relocation is not credible and is without foundation.

. . . .

27. The court also finds it just and equitable that [Nancy Ann] make the necessary arrangements with the appropriate government agency to re-issue the W 2 forms.

. . . .

## II.  CONCLUSIONS OF LAW

. . . .

4. The court concludes that the September 24, 1999 order was law of the case.

5. As law of the case, the September 24, 1999 order was binding upon both parties.

### DISCUSSION

#### A.

■ Nancy Ann contends that Edward's failure to timely appeal the September 24, 1999 Order precludes him from challenging it in this appeal. In other words, Nancy Ann contends that the September 24, 1999 Order was final and appealable when entered and Edward's February 8, 2000 notice of appeal was filed too late to generate appellate jurisdiction over the September 24, 1999 Order. To decide this question, a clear understanding of the relevant actions is appropriate.

| | |
|---|---|
| June 23, 1998 | The Divorce Decree ordered the sale of the marital residence and the division of the net proceeds 60% to Nancy Ann and 40% to Edward. |
| May 13, 1999 | Nancy Ann moved under HFCR Rules 60(b)(2) and (6) for a modification of the Divorce Decree to divide the funds received from HAP. This motion erroneously assumed that a motion to enforce the Divorce Decree could not accomplish the result sought. |
| September 24, 1999 | The family court awarded each party 50% of the HAP payment relating to the sale of the marital residence and awarded Edward 100% of any other payment from HAP including payment made with respect to Edward's relocation. This order did not decide what part of HAP's payment related to the sale of the marital residence and what part, if any, was a payment for Edward's relocation. |
| October 1, 1999 | Nancy Ann moved for an order requiring Edward to pay her $121,407.46 (50% of the $242,814.91 HAP payment to Edward) plus 10% interest from August 5, 1999. In response, Edward requested that certain of his expenses be categorized within the relocation category rather than the sale of the marital residence category. |
| January 10, 2000 | The family court decided that Edward was authorized to withhold $6,015.75 in reimbursement of his moving expenses and awarded the balance 50% to each party. |

The September 24, 1999 Order did not fully decide Nancy Ann's May 13, 1999 motion. This is understandable because no evidence had been presented to the family court of the HAP payment. In essence, Nancy Ann's October 1, 1999 motion asked the family court to decide the issues undecided by the September 24, 1999 Order. Her motion asked the family court to decide what expenses Edward actually incurred, what expenses related to the sale of the marital residence, and what expenses, if any, were made with respect to Edward's relocation.

Because the September 24, 1999 Order did not fully decide Nancy Ann's May 13, 1999 motion, we conclude it was not final and appealable when entered. Nancy Ann's May 13, 1999 motion was not completely decided until the entry of the January 10, 2000 Order. Therefore, Edward's February 8, 2000 notice of appeal was not filed too late to generate appellate jurisdiction over the September 24, 1999 Order and Edward's valid appeal of the January 10, 2000 Order permits a challenge to the September 24, 1999 Order. *Familian Northwest, Inc. v. Central Pacific Boiler & Piping, Ltd.*, 68 Haw. 368, 369–70, 714 P.2d 936, 937 (1986).

### B.

Edward contends that the family court was "without jurisdiction to grant [Nancy Ann] the relief requested in her 13 May 1999 motion, and the 24 September 1999 Order . . . is therefore void."

Alternatively, Edward contends that the family court erred in awarding any part of the HAP benefit to Nancy Ann because "the HAP benefit was (a) not a marital asset, and (b) was otherwise not properly divisible since it is not specifically referred to in the Decree."

Edward argues that

[q]uite simply, given the release incorporated into the 23 June 1998 divorce decree, the only proper motion under Rule 60, HFCR [Hawai'i Family Court Rules], would have been a Rule 60(b)(3) motion. A Rule 60(b)(6), HFCR, motion was not the proper vehicle since absent fraud or fraudulent concealment, there is simply no *other reason justifying relief from operation of the judgment.* The same analysis applies

with respect to any motion made pursuant to Rule 60(b)(2), HFCR.

(Emphasis in original.)

Edward contends that assuming the family court had the necessary jurisdiction, the family court erred in ordering that "[Nancy Ann] is entitled to receive 50% of any payments that are made pursuant to the Housing Assistance Program (HAP) in relation to the sale of the parties' former marital residence."

■ Edward's arguments require a proper characterization of the family court's decisions. The family court concluded that (1) the basis of Nancy Ann's right to a percentage of the HAP payment was the Divorce Decree's award to her of a percentage of the proceeds from the sale of the marital residence, and (2) the release specified in the Divorce Decree did not apply to that right. We agree with the family court. The Divorce Decree ordered the sale of the marital residence and the distribution of a specified percentage of the sales proceeds to each of the parties. Some of these proceeds were received in August 1998 from the purchaser of the marital residence. Additional proceeds were received from HAP in May 1999 after Edward relocated to San Diego.

Edward was a federal government employee. The closing of the Barber's Point Naval Air Station caused him to relocate his place of employment to San Diego and impacted negatively on the price for which he was reasonably able to sell the marital residence. There were various conditions precedent to the HAP payment. Edward's relocation was one of the conditions precedent. However, the HAP payment did not compensate Edward for any of his moving/relocation expenses or the reduction of his Cost of Living Allowance.

As noted above, the HAP, 42 U.S.C.A. § 3374 (Supp.1998), states, in relevant part, as follows:

**Acquisition of property at or near military bases which have been ordered to be closed**

**(a) Authorization; conditions precedent**

. . . [T]he Secretary of Defense is authorized . . . to reimburse for certain losses upon private sale . . . if he determines—

. . . .

(3) that as the result of the actual or pending closing of such base or installation, . . . there is no present market for the sale of such property upon reasonable terms and conditions.

. . . .

### (c) Election of benefits; . . . .

Such persons as the Secretary of Defense may determine to be eligible under the criteria set forth above shall elect either (1) to receive a cash payment as compensation for losses which may be or have been sustained in a private sale, in an amount not to exceed the difference between (A) 95 per centum of the fair market value of their property (as such value is determined by the Secretary of Defense) prior to the public announcement of intention to close all or part of the military base or installation and (B) the fair market value of such property (as such value is so determined) at the time of the sale, or (2) to receive, as purchase price for their property, an amount not to exceed 90 per centum of prior fair market value as such value is determined by the Secretary of Defense, or the amount of the outstanding mortgages. The Secretary may also pay a person who elects to receive a cash payment under clause (1) of the preceding sentence an amount that the Secretary determines appropriate to reimburse the person for the costs incurred by the person in the sale of the property[.]

Expressly, the HAP payment was "compensation for losses which . . . have been sustained in a private sale" because "as the result of the actual or pending closing of such base or installation . . . there is no present market for the sale of such property upon reasonable terms and conditions." The HAP payment also was "to reimburse the person for the costs incurred by the person in the sale of the property[.]" Simply stated, the HAP payment was in part to reimburse closing costs (including attorney fees) and in part to compensate for the negative impact the closing of Barber's Point Naval Air Station had on the market value of the marital residence. Nancy Ann's right to a specified percentage of the proceeds of the sale of that marital residence included her right to a specified percentage of that reimbursement and compensation.

■ Citing the rule that income that is earned and received post-divorce is not properly divisible in an action for divorce, *Jones v. Jones*, 7 Haw.App. 496, 499, 780 P.2d 581, 584 (1989), Edward points out that for tax purposes, the funds he received from HAP are income. He cites the following regulations:

... Title 26, Code of Federal Regulations, Section 1.82–1(a)(1) provides that "Any amount received or accrued, directly or indirectly, by an individual as a payment for or reimbursement of expenses of moving from one residence to another residence attributable to employment or self-employment is includable in gross income under section 82 *as compensation for services in the taxable year received or accrued."* ... Title 26, Code of Federal Regulations, Section 1.82–1(a)(5) provides (in pertinent part):

Any amount received or accrued from an employer, ... in connection with the performance of services for such employer ... is attributable to employment. ... Thus, for example, if an employer reimburses an employee for a loss incurred on the sale of the employee's house, reimbursement is attributable to the performance of services if made because of the employer-employee relationship.

... Internal Revenue Service's Revised Ruling 76–342, 1976–2 C.B. 22, which provides (in pertinent part):

. . . .

The cash payment that Federal civilian employees ... may elect to receive under the provisions of section 3374(c) of Title 42 as compensation for losses that may be or have been sustained in a private sale of their personal residence is a payment attributable to their employment since it is received in connection with the performance of service for their employer. Accordingly, the amount received is includable in the

gross income of the employee *as compensation for services* under the provisions of section 82 of the Code. *The payment is not considered a part of the selling price of the personal residence[.]*

(Emphases in original.)

There are two errors in Edward's argument. The first is his conclusion that the rule that income that is earned and received post-divorce is not properly divisible in an action for divorce applies to payments relating to the sale of the marital residence. The second is his conclusion that the characterization of a receipt for tax purposes conclusively characterizes it for property distribution purposes in a divorce case. He fails to recognize that sometimes, as in this case, the characterization for tax purposes differs from the characterization for divorce purposes.

In this case, the payment from HAP (a) reimbursed the closing costs paid in the sale of the marital residence and (b) paid for most of the negative impact the closing of Barber's Point Naval Air Station had on the market value of the marital residence. As noted above, 42 U.S.C.A. § 3374(a)(3) prohibited compensation absent a determination by the Secretary of Defense "that as the result of the actual or pending closing of such base or installation ... there is no present market for the sale of such property upon reasonable terms and conditions." 42 U.S.C.A. § 3374(c) specifies that the payment is (a) "compensation for losses which may be of have been sustained in a private sale," and (b) "to reimburse the person for the costs incurred by the person in the sale of the property[.]" Therefore, in this divorce case, the compensation is partly closing costs and partly a part of the value of the marital residence. It is not "income earned and received post-divorce[.]"

### ·C.

■ Edward contends that the family court erred in ruling that the September 24, 1999 Order was the law of the case.[3] This

point lacks purpose. In this appeal of the January 10, 2000 Order, Edward is authorized to challenge the validity of the September 24, 1999 Order. The fact that the judge who entered the January 10, 2000 Order viewed the September 24, 1999 Order as the law of the case does not inhibit Edward's right in this appeal to challenge the validity of the September 24, 1999 Order.

Moreover, the September 24, 1999 Order did not answer the essential questions presented by Nancy Ann's May 13, 1999 motion. Therefore, assuming the court erred in considering the September 24, 1999 Order as the law of the case, that error was harmless.

### D.

■ Challenging findings of fact (FsOF) nos. 14, 15, and 16, Edward contends that the family court erred in ruling that he was not entitled to a credit/set-off for the expenses he incurred in relocating his mother to San Diego. Edward's position is that the expenses were related to his relocation from Honolulu to San Diego.

Challenging FOF no. 16, Edward contends that the family court erred in ruling that he was not entitled to a credit/set-off for per diem expenses incurred in connection with his relocation from Honolulu to San Diego.

Challenging FOF no. 23, Edward contends that the family court erred in ruling that he was not entitled to a credit/set-off for his income reduction that resulted from his relocation from Honolulu to San Diego. *See* footnote 2 above.

Paragraph 1 of the family court's September 24, 1999 Order states that Nancy Ann is entitled to 50% of any payment by HAP that related to the sale of the marital residence.

Paragraph 2 states that Edward can keep any payment by HAP for relocation expenses or that does not relate to the sale of the marital residence. The family court's January 10, 2000 Order decided that $6,015.75 of the payment by HAP was for relocation expenses and the balance related to the sale of the marital residence. The question is

---

**3.** Law of the case is discussed in *Wong v. City and County of Honolulu*, 66 Haw. 389, 395–96,

665 P.2d 157, 162 (1983).

whether the family court was right when it decided that the balance of the payment by HAP related to the sale of the marital residence. In light of 42 U.S.C.A. § 3374, we conclude that the answer is yes.

## CONCLUSION

Accordingly, we affirm the family court's (1) September 24, 1999 Order Granting in Part Plaintiff's Motion for Post Decree Relief Filed May 13, 1999, and (2) January 10, 2000 Order Re: Trial of December 3, 1999.